UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

CHARLES SALIS,

       Plaintiff,

   v.

NORTH OKALOOSA FIRE DISTRICT,

      Defendant.

CASE NO: 18-cv-00147-MCR-GRJ

## DEFENDANT'S STATEMENT OF FACTS AND MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant, North Okaloosa Fire District ("the District"), by and through undersigned counsel and pursuant to Federal Rule of Civil Procedure 56 and Local Rules 7.1 and 56.1, hereby files *Defendant's Statement of Facts and Memorandum of Law in Support of its Motion for Summary Judgment* as follows.

## I. UNDISPUTED MATERIAL FACTS

**A.     North Okaloosa Fire District**

The District is a professional fire department located in Crestview, Florida. (Howe Decl. ¶2).  The District employs professional firefighters and also accepts volunteers.  There are two types of volunteers at the District.  (Howe Decl. ¶3). One type is an actual volunteer firefighter.  (Howe Decl. ¶4). Volunteer firefighters possess a Firefighter I Certification.  (Howe Decl. ¶4). Volunteer firefighters are

permitted to enter a hot zone to fight fires, and engage in other emergency and lifesaving tasks while on scene.  (Howe Decl. ¶4).

The other type of volunteer is a person that volunteers at the District without a Firefighter I Certification.  (Howe Decl. ¶5).  A volunteer that is not certified cannot enter a hot zone and is limited to assisting while on scene.  (Howe Decl. ¶5).  Plaintiff was a volunteer and not a volunteer firefighter during his tenure with the District because he did not have a Firefighter I Certification. (Pl. Depo. 30, 151; Howe Decl. ¶6).

The Chief and Deputy Chief make up the District's management team. (Howe Decl. ¶8). The Chief has absolute authority to determine who can volunteer at the District, and to remove someone from the volunteer roster.  (Howe Decl. ¶8). At all times during Plaintiff's volunteer tenure, the District's Chief was Edward Cutler and Brian Howe was the Deputy Chief.  (Howe Decl. ¶8).  The Chief reports to the District's Board of Commissioners.  (Howe Decl. ¶9).

The District employs professional firefighters in twenty-four hour shift positions and forty hour per week positions.  (Howe Decl. ¶10).  Volunteers, however, do not have a fixed schedule, and they are free to volunteer whenever they desire.  (Pl. Dep. 82-83; Howe Decl. ¶11). Additionally, volunteers do not receive compensation or benefits such as life insurance, health insurance, or disability insurance.  (Pl. Dep. 91-93; Howe Decl. ¶11). In 2017 and 2018, some

volunteers received a discretionary Christmas bonus of $200.00.   (Howe Decl. ¶11).   Volunteers are covered by the District's workers compensation insurance pursuant to Florida law.  (Howe Decl. ¶11).

A person must complete an application to volunteer at the District.  (Howe Decl. ¶7).  The District does not have any minimum requirements to volunteer and does not conduct any background checks.  (Pl. Dep. 53-54; Howe Decl. ¶7).  It is the responsibility of the volunteer applicant to obtain and provide the District a criminal history report, driving report, and medical evaluation.  (Howe Decl. ¶7). The District reviews those reports when provided by the volunteer applicant and places the person on the volunteer roster if the reports do not reflect any problems. (Howe Decl. ¶7).  The District then reviews the volunteer's performance after the first six months and decides whether to retain or remove the volunteer from the roster.  (Howe Decl. ¶12).

## B.   Plaintiff's Volunteer Tenure with the District

Plaintiff applied to volunteer at the District on Friday, January 6, 2017, and marked the "volunteer box."  (Pl. Dep. 53, 64-65, Ex. 6).  Plaintiff spoke to Deputy Chief Brian Howe for 20 minutes when he presented his volunteer application, and did not interview with anyone at the District or go through a hiring committee.  (Pl. Dep. 62-63).  In order to complete his volunteer application, Plaintiff was required

to obtain and provide the District a criminal records search, a driving history report, and a medical evaluation. (Pl. Dep. 55-60, Ex. 3-5; (Howe Decl. ¶7).

Plaintiff was placed on the District's volunteer roster on January 9, 2017, by the former Chief, Edward Cutler. (Pl. Dep. 6; Cutler Decl. ¶3). Plaintiff was placed on the volunteer roster as an "on scene assistant" because he did not have a Firefighter I Certification. (Pl. Dep. 30, 151, Ex. 6; Cutler Dep. 13-14, 29-30; Howe Decl. ¶6). Plaintiff did not have a Firefighter I Certification at the conclusion of his volunteer tenure or as of his deposition on January 18, 2019. (Pl. Dep. 30).

Plaintiff did not have to sign a contract to volunteer at the District, and he never signed any contract pertaining to his volunteer status with the District. (Pl. Dep. 67). No one at the District prevented Plaintiff from making or enforcing any contracts, and Plaintiff never tried to enter a contract while volunteering with the District. (Pl. Dep. 142). Additionally, no one from the District prevented Plaintiff from initiating a legal action, being a party in any legal action, or giving evidence in any type of proceeding. (Pl. Dep. 142-43).

As a District volunteer Plaintiff performed necessary vehicle maintenance and whatever needed to get done at the station. (Pl. Dep. 78). Plaintiff also went on medical calls, motor vehicle accidents, and two structure fires. (Pl. Dep. 78). Plaintiff's on scene assistance was limited to the level of training he completed.

(Pl. Dep. 79).  Plaintiff obtained his EMR certification in February 2017, which allowed him to assist on medical calls.  (Pl. Dep. 80-81).    On medical calls Plaintiff assisted the Emergency Medical Services (EMS) professionals with whatever they requested. (Pl. Dep. 79).

**C.     Plaintiff is Caught on Video Entering a Professional Firefighter's Sleeping Quarters Without Permission**

On March 8, 2017, Firefighter Jason Clarke told Plaintiff to remain at the station because three people weren't needed for a medical call.  (Pl. Dep. 112-13). When Clarke left the station Plaintiff entered his room without permission.  (Pl. Dep. 108).  Clarke's video camera captured Plaintiff inside his room without permission while Clarke was on the call.  (Pl. Dep. 108, Ex. 21).

Clarke posted an image from the video of Plaintiff inside his room so that other firefighters were aware of his actions in the event they were missing personal belongings.  (Clarke Dep. 23; Pl. Dep. Ex. 18-20).  Clarke did not have any problems with Plaintiff and thought he was a good person until Clarke caught Plaintiff inside his room.  (Clarke Dep. 39, 67).

Clarke showed the video to the shift supervisor, Jonathan Flowers.  (Clarke Dep. 22-23; Pl. Dep. 21).  Flowers subsequently met with Plaintiff to issue a "verbal warning" and told him "we do not need to go into any bunkroom that is not yours due to personal property being stolen and tampered with in the past" and "we stay out of each other's bunkroom to protect ourselves as well as the personal

property we own." (Pl. Ex. 21). Plaintiff does not believe Flowers was involved in the alleged race discrimination or retaliation. (Pl. Dep. 94, 126).

**D.    Plaintiff is Pulled Over and Issued a Careless Driving Warning**

Plaintiff was stopped by a sheriff on March 13, 2017, because he was engaged in "improper passing, and forcing vehicles off the road" while driving with red and white emergency lights activated. (Pl. Dep. 132; Nobles Dep. 5, 7; Ex. 1). Plaintiff told the sheriff he was responding to a call but the alleged call actually occurred days before. (Pl. Dep. 132; Nobles Dep. 6-7). The Sheriff issued Plaintiff a written warning for careless driving. (Nobles Dep. 7; Ex. 1).

Chief Cutler and Deputy Chief Howe spoke to Plaintiff about improperly using emergency lights on his personal vehicle. (Pl. Dep. 134). Plaintiff was told "it was improper to use lights when not going to a call." (Pl. Dep. 134). Plaintiff was also directed to remove the emergency lights from his personal vehicle and was told firefighters cannot have a siren on their personal vehicle. (Pl. Dep. 134-35). Deputy Chief Howe documented the incident with a memorandum for the record. (Pl. Dep. Ex. 22).

**E.    Plaintiff's Removal from the Volunteer Roster**

Chief Cutler made the decision to remove Plaintiff from the volunteer roster. (Cutler Dep. 12-13; Cutler Decl. ¶4). Chief Cutler and Deputy Chief Howe met with Plaintiff after his first six months of volunteering to address the decision to

remove him from the roster.  (Pl. Dep. Ex. 23).  During the meeting that occurred on July 8, 2017, Plaintiff was told that his "services were no longer needed."  (Pl. Dep. 136).  Additionally, Plaintiff was handed a document signed by Cutler and Howe that stated as follows:

> We have looked at all aspects of your status with us as a volunteer, both on the job as well as a representative of the North Okaloosa Fire District. We have determined, with much regret, that we must terminate your relationship with the North Okaloosa Fire District at this time.

(Pl. Dep. 136, Ex. 23).

Plaintiff then began directing profanity at Cutler and Howe.  (Pl. Dep. 137). Plaintiff said "fuck off" and threw his equipment and uniforms on the ground prior to leaving the station.  (Howe Decl. ¶13; Cutler Decl. ¶5; Pl. Dep. 138-39).  At no time did Cutler or Howe direct profanity at Plaintiff.  (Pl. Dep. 137).  Moreover, Cutler and Howe did not tell Plaintiff he was being removed from the volunteer roster because of his race, or in retaliation for allegedly complaining about race discrimination, expired equipment, or Cutler purportedly misappropriating funds. (Pl. Dep. 140-41).

Chief Cutler also removed a Caucasian male named Dean Matthews from the District's volunteer roster.  (Cutler Dep. 50-51, 55; Cutler Decl. ¶6).  Matthews was removed from the District's volunteer roster over three years before Plaintiff's removal.  (Cutler Decl. ¶6).

**F.    Alleged Race Discrimination**

Plaintiff alleged Jason Clarke, Dennis McMaster, Chief Cutler, and Deputy Chief Howe discriminated against him because of his race.  (Pl. Dep. 94).

**1.    Jason Clarke**

The alleged race discrimination attributed to Clarke is that he would "bully" Plaintiff, telling Plaintiff that he did not want Plaintiff on his shift, telling Plaintiff he was not needed while leaving him at the station three times, telling Plaintiff the call was under control when leaving him inside the truck, telling Plaintiff to ask somebody else, he did not know, or he did not have time in response to Plaintiff's questions, saying Plaintiff administered oxygen or nitroglycerin outside of the department and was stealing, posting a "Butthurt Report," and posting the image of Plaintiff inside Clarke's room while Clarke was away on a call because Plaintiff claims he was adjusting himself.  (Pl. Dep. 94-98, Ex. 17, 19).

Clarke bullied Caucasian volunteers and firefighters.   (Pl. Dep. 148-49). Clarke has not taken a Caucasian volunteer named Drew Taylor on calls and has left him at the station three times.  (Taylor Decl. ¶¶ 1, 4; Clarke Dep. 65).  Plaintiff was left in the truck with a Caucasian volunteer, and outside of that incident Plaintiff does not know whether Clarke left other Caucasian volunteers inside the truck while on a call.  (Pl. Dep. 176-77, 199).  Plaintiff did not get in trouble as a result of Clarke allegedly saying Plaintiff administered oxygen and nitroglycerin,

and stole from the department.  (Pl. Dep. 98).  The allegedly posted "Butthurt Report" does not contain Plaintiff's name or a racially derogatory comment.  (Pl. Dep. 99, Ex. 17).  The posted image of Plaintiff shows him inside Clarke's sleeping quarter without permission while Clarke was responding to a call.  (Pl. Dep. 108, Ex. 19).  Plaintiff's complaint about the image was that it allegedly showed him "adjusting himself" as opposed to being racially offensive.  (Pl. Dep. 107-08).  Clarke never told Plaintiff that the incidents Plaintiff claims are discrimination were done because of Plaintiff's race.  (Pl. Dep. 113).

## 2.  **Dennis McMaster**

The only alleged race discrimination attributed to McMaster is that he purportedly failed to do anything when Plaintiff allegedly told him that Clarke was not letting him go on calls and making him stay in the vehicle because of his race.  (Pl. Dep. 114).  Plaintiff admitted, however, that he does not know whether McMaster addressed his alleged complaint about Clarke or whether McMaster spoke to Clarke about the alleged complaint.  (Pl. Dep. 114-15).  McMaster never told Plaintiff that he was discriminating against him because of his race or that he did not address Plaintiff's alleged complaint because of his race.  (Pl. Dep. 115).

## 3.  **Chief Edward Cutler**

The alleged race discrimination attributed to Cutler is his purported participation in a conversation where the word "monkey" was allegedly used to

refer to Plaintiff.  (Pl. Dep. 116).  Plaintiff admits, however, that he does not know who said "monkey" because Cutler was in his office with Deputy Chief Howe and a third unknown person when the comment was made and he did not see who said the word.  (Pl. Dep. 116-17, 212-13).

The other reason Plaintiff claimed Cutler discriminated against him was Cutler's alleged failure to address Plaintiff's race discrimination complaint about Clarke and McMaster.  (Pl. Dep. 116, 119).  Plaintiff claims he told Cutler that Clarke was discriminating against him as a result of his race because Clarke was not allowing him to go on calls or exit the vehicle, posted the "Butthurt Report," and posted the image of Plaintiff inside Clarke's room while Plaintiff claims he was adjusting himself.  (Pl. Dep. 118).  Plaintiff claimed he complained to Cutler about Clarke four times.  (Pl. Dep. 119).

Plaintiff claimed he told Cutler that McMaster did not take any corrective action against Clarke as a result of Plaintiff's complaint to McMaster.  (Pl. Dep. 119).  Plaintiff allegedly complained to Cutler about McMaster one time. (Pl. Dep. 119-20).  Cutler told Plaintiff he would investigate his complaint about McMaster. (Pl. Dep. 119).

### 4.    **Deputy Chief Brian Howe**

The alleged race discrimination attributed to Howe was his presence in the office when the purported "monkey" remark was made, a Facebook post

suggesting a resemblance between a photograph of Hitler and Howe, political Facebook posts about President Barack Obama and Hillary Clinton, Howe's alleged failure to address Plaintiff's complaint about Clarke saying Plaintiff administered oxygen and nitroglycerin, and leaving Plaintiff at the station and in the truck during calls. (Pl. Dep. 120, 124-26).

Plaintiff does not know whether it was Howe who said the alleged "monkey" remark.  (Pl. Dep. 120).  Plaintiff did not speak to Howe about the Facebook post comparing the physical resemblance of the Hitler photograph to Howe's picture, and he does not know whether Howe was making a joke about the physical resemblance of the photographs.  (Pl. Dep. 121-22; Howe Decl. ¶14, Ex. A). Howe's comparison of the photographs was a joke, and he never told Plaintiff that the comparison of the pictures was done because Howe is a racist. (Howe Decl. ¶14; Pl. Dep. 122).  Plaintiff does not know Howe's political affiliation, or the reason Howe was being critical of President Obama or Hillary Clinton on Facebook.  (Pl. Dep. 123-24).  Howe's Facebook posts are politically motivated because he is a Republican, and Howe never told Plaintiff that he was being critical of President Obama because Howe is a racist. (Howe Decl. ¶15, Ex. B; Pl. Dep. 124).

### G.    Alleged Section 1981 Retaliation

Plaintiff alleged Jason Clarke, Dennis McMaster, Chief Cutler, and Deputy Chief Howe retaliated against him because he purportedly complained about race discrimination.   (Pl. Dep. 126).   Plaintiff only verbally complained about the alleged race discrimination to Chief Cutler, Deputy Chief Howe, Dennis McMaster, Kevin Kendrick, Jonathan Flowers, and Drew Taylor. (Pl. Dep. 145, 150).

### 1.    <u>Jason Clarke</u>

The purported retaliation attributed to Clarke is the same allegations that Plaintiff claims constitute race discrimination plus one more incident.   (Pl. Dep. 126, 128).   The one additional incident is Clarke's consideration of filing a fraud complaint against Plaintiff with the military's Inspector General because Clarke believed Plaintiff was committing fraud by improperly receiving V.A. benefits on the basis of being completely disabled while simultaneously trying to become a volunteer firefighter. (Pl. Dep. 126-27; Clarke Dep.   43). Clarke had not filed a complaint against Plaintiff with the Inspector General as of January 18, 2019.  (Pl. Dep. 127; Clarke Dep. 43).

Plaintiff does not know whether Cutler or Howe told Clarke about Plaintiff's alleged race discrimination complaints, and he does not know who told Clarke.

(Pl. Dep. 128-29).   Plaintiff only complained to Chief Cutler about Clarke's alleged retaliation.  (Pl. Dep. 130).

### 2.    Dennis McMaster

The purported retaliation attributed to McMaster is the same allegations that Plaintiff claims constitute race discrimination.   (Pl. Dep. 129).   Specifically, McMaster purportedly failed to do anything when Plaintiff allegedly told him that Clarke was not letting him go on calls and making him stay in the vehicle because of his race.  (Pl. Dep. 129-30).   Plaintiff did not complain about McMaster's alleged retaliation.  (Pl. Dep. 130).

### 3.    Chief Edward Cutler

The purported retaliation attributed to Cutler is his decision to remove Plaintiff from the volunteer roster, failing to create a "healthy work environment," and not investigating Plaintiff's race discrimination complaints.  (Pl. Dep. 130).

### 4.    Deputy Chief Brian Howe

The purported retaliation attributed to Howe is his alleged failure to create a "healthy work environment" and not investigating Plaintiff's race discrimination complaints.  (Pl. Dep. 131).

### 5.    Alleged "crybaby bitch" and "snitch" posting

Plaintiff alleged he observed a paper on a District refrigerator that used the words "crybaby bitch" and "snitch" in reference to a volunteer.  (Pl. Dep. 193-94).

The alleged posting did not refer to Plaintiff and it was removed within a matter of minutes.  (Pl. Dep. 194).  At the time of the purported posting the District had Caucasian volunteers.  (Pl. Dep. 194).  Plaintiff claims he only told Chief Cutler about the alleged posting.  (Pl. Dep. 195).

## H.   Whistle Blower Claim

Plaintiff did not present a written complaint against anyone at the District alleging he was being discriminated against because of his race.  (Pl. Dep. 146-47, 151, 173).  Plaintiff did not complain verbally or in writing to anyone regarding the alleged race discrimination he attributes to Chief Cutler and Deputy Chief Howe. (Pl. Dep. 151).  Plaintiff did not present any written complaints about the District's alleged use of expired equipment.   (Pl. Dep. 152, 173).   Plaintiff's verbal complaints to Chief Cutler and Deputy Chief Howe about the alleged use of expired equipment occurred in February and March 2017.   (Pl. Dep. 153-54). Plaintiff never complained verbally or in writing to anyone regarding Chief Cutler or Deputy Chief Howe purportedly failing to do anything about his allegations pertaining to the use of expired equipment.  (Pl. Dep. 158-59, 173).  Plaintiff did not complain verbally or in writing to anyone regarding Chief Cutler's alleged misappropriation of District funds. (Pl. Dep. 159-60, 173).

Plaintiff did not participate in any investigation, hearing, or inquiry that was conducted by a local, state, or federal entity.  (Pl. Dep. 167-68, 192-93).  Plaintiff

never initiated a complaint through any whistleblower hotline, the hotline of the Medicaid Fraud Control Unit of the Department of Legal Affairs, the Chief Inspector General of the Executive Office of the Governor, the Florida Commission on Human Relations, a District employee designated as the District's Inspector General, or a written complaint with any supervisor of the District. (Pl. Dep. 172-74).

Plaintiff did not have authority to impose any type of adverse action on District employees or volunteers and was never told to impose any adverse action on District employees or volunteers. (Pl. Dep. 170, 172). Plaintiff never discharged any District employee, did not have authority to terminate District employees, and was never told to discharge District employees or volunteers. (Pl. Dep. 168-70). Plaintiff did not have authority to suspend District employees or volunteers, and was never told to suspend District employees or volunteers. (Pl. Dep. 169, 171). Plaintiff did not have authority to transfer District employees or volunteers, and was never told to transfer District employees or volunteers. (Pl. Dep. 169, 171). Plaintiff did not have authority to demote District employees or volunteers, and was never told to demote District employees or volunteers. (Pl. Dep. 169). Plaintiff did not have authority to withhold a bonus for District employees or volunteers, and was never told to withhold a bonus of a District employee or volunteer. (Pl. Dep. 169-71). Plaintiff did not have authority to

reduce the salary or benefits of a District employee, and was never told to reduce the salary or benefits of a District employee.  (Pl. Dep. 170, 172).

## I.   Alleged Claims after Plaintiff's Removal from the District's Volunteer Roster

Plaintiff visited the Baker Volunteer Fire Department one time in August 2017 to submit his volunteer application.  (Pl. Dep. 23, 179).  During the visit Plaintiff spoke to "Chief Dusty" and was allegedly told "you have to have thick skin to work around the fire department, and you have to have thick skin to work here. Do you have thick skin?"  (Pl. Dep. 180).  Plaintiff does not know whether "Chief Dusty" spoke to Chief Cutler, Deputy Chief Howe, or anyone at the District about Plaintiff.  (Pl. Dep.  181-82).

Plaintiff spoke to a person he "believes" was the Deputy Chief at the Almarante Volunteer Fire District.  (Pl. Dep. 185).   During the conversation Plaintiff claims he asked whether Almarante was accepting volunteer applications and the alleged Deputy Chief told him to provide a resume and he would get back to Plaintiff.  (Pl. Dep. 184-85).  The Almarante Deputy Chief never contacted Plaintiff.   (Pl. Dep. 184-85).   Plaintiff does not know whether the alleged Almarante Deputy Chief spoke to Chief Cutler, Deputy Chief Howe, or anyone at the District about Plaintiff.  (Pl. Dep.  186). Chief Cutler, Deputy Chief Howe, and Jason Clarke did not provide an employment reference to anyone about Plaintiff. (Cutler Dep. 49; Howe Decl. ¶16; Clarke Dep. 97).

Plaintiff applied for a non-paying volunteer position at the Holt Volunteer Fire Department after he was removed from the District's volunteer roster.  (Pl. Dep. 23, 178-79, 184-85).  Plaintiff was accepted as a volunteer at the Holt Fire Department in December 2017.  (Pl. Dep. 24).  Plaintiff receives three to four calls per week with Holt, and volunteers five to fifteen hours on a biweekly basis.  (Pl. Dep. 25, 31-32).  Plaintiff does not receive compensation, annual bonus, health insurance, or any other benefits for volunteering with the Holt Fire Department. (Pl. Dep. 24-25).

Plaintiff has not applied for any paid positions and has not worked for pay after being removed from the District's volunteer roster.  (Pl. Dep. 25-26).

## II.    MEMORANUM OF LAW

### A.    Summary Judgment Standard

Summary judgment is warranted when a plaintiff in an action "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986), *cert. denied* 484 U.S. 1066 (1988).  The mere existence of a scintilla of evidence in support of a plaintiff's position is insufficient to avoid a properly supported motion for summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 252 (1986). The Eleventh Circuit has noted that summary judgments in favor of defendants are

not rare in employment discrimination cases, and that if a plaintiff fails to carry his burden of proof by offering only evidence that is "merely colorable or is not significantly probative," summary judgment is appropriately granted. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080-81 (11th Cir. 1990).

**B.     The District is Entitled to Summary Judgment on Plaintiff's Section 1981 Race Discrimination Claim because his Right to Contract was not Impaired.**

Under 42 U.S.C. § 1981(a), "[a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." Section 1981 protects against race discrimination in the making and enforcement of contracts. *See Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454 (1975)("Title 42 U.S.C. § 1981, being the present codification of § 16 of the century-old Civil Rights Act of 1870, . . . on its face relates primarily to racial discrimination in the making and enforcement of contracts."); *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956 (11th Cir. 1997)("It is well-established that section 1981 is concerned with *racial* discrimination in the making and enforcement of contracts."). In fact, the Supreme Court has stated that "[a]ny claim brought under *§ 1981*, therefore, must initially identify an impaired 'contractual relationship' . . . under which the plaintiff has rights." *Domino's Pizza, Inc., v. McDonald*, 546 U.S. 470, 476 (2006)(emphasis in original).

1. **Plaintiff's volunteer tenure with the District was governed by statute as opposed to an alleged contract.**

Section 1981 is inapplicable to Plaintiff because his volunteer tenure with the District was defined by statute. *See Woodson v. State of California*, No. 2:15-CV-01206-MCE-CKD, 2016 U.S. Dist. LEXIS 153573 at 18 (E.D. Cal. Nov. 4, 2016)(section 1981 does not protect Plaintiff as a Foster Grandparent volunteer because her position as a volunteer is defined by statute rather than contract); *Espinoza v. City of Tracy*, No. 2:15-751-WBS-KJN, 2017 U.S. Dist. LEXIS 18789 at 3-4, 2017 WL 531853 (E.D. Cal. Feb. 9, 2017)("plaintiff is not entitled to section 1981 protection because his employment is governed by statute").

Plaintiff's volunteer status with the District was governed by section 633.416, Florida Statutes, which states in relevant part as follows:

A fire service provider may not retain the services of an individual volunteering to extinguish fires for the protection of life or property or to supervise individuals who perform such services unless the individual holds a current and valid Volunteer Firefighter Certificate of Completion.

A fire service provider must notify the division electronically, as directed by rule by the division, within 10 days after:

The retention of a volunteer firefighter.

A decision not to retain a volunteer firefighter.

Notification under paragraph (a) must include:

1.     The individual's name.
2.     The date on which he or she was . . . retained.
3.     The last date of . . . retention before leaving the fire service provider.

      4.     Any other information deemed necessary by the division to determine compliance with ss. 633.414 and 633.426

Fla Stat. § 633.416(2), (3)(a), (4)(a) 2, 4, (4)(b) 1-4. It is clear from the aforementioned statutory language that Plaintiff's volunteer status with the District is governed by statute as opposed to an alleged contract, and section 1981 does not apply to such a relationship.

      **2.**     **Assuming *arguendo* Plaintiff's volunteer tenure with the District was not statutory, he is nevertheless unable to identify an impaired contractual relationship.**

It is undisputed Plaintiff did not have to sign a contract to volunteer at the District, and he never signed any contract pertaining to his volunteer status with the District. (Pl. Dep. 67). Additionally, no one at the District prevented Plaintiff from making or enforcing any contracts, and Plaintiff never tried to enter a contract while volunteering with the District. (Pl. Dep. 142).

The undisputed evidence also establishes Plaintiff's alleged right to contract as a volunteer was not impaired. First, Plaintiff did not have his Firefighter I Certification while volunteering with the District and still did not possess said certification as of the date of his deposition on January 18, 2019. (Pl. Depo. 30, 151). Second, Plaintiff's removal from the District's volunteer roster did not prohibit him from continuing to pursue his Firefighter I Certification. (Pl. Dep. Ex. 9, p. 3, 5-6). In fact, Plaintiff was free to continue pursuing his Firefighter I Certification through "training centers," "facilities other than approved training

centers," or "alternative delivery techniques" such as "on line training." (Pl. Dep. Ex. 9, p. 6). Third, Plaintiff was free to apply for a volunteer position at other fire departments and the record establishes he applied at the Holt, Baker and Almarante fire departments. (Pl. Dep. 23, 179, 184-85). Finally, Plaintiff was accepted as a volunteer at the Holt Fire Department within five months of being removed from the District's volunteer roster. (Pl. Dep. 24).

### 3.    Plaintiff's suggestion that his volunteer tenure with the District amounts to an at-will employment contract is misplaced.

An exchange of pay for labor is necessary to establish an at-will employment contract under section 1981. *See Moghadam v. Morris*, 87 F. Supp. 2d 1255, 1262 (N.D. Fla. 2000)(section 1981 applies to at-will employee where "the essence of the relationship is the 'exchange of labor and pay,' and therefore some sort of contractual relationship exists"); *Farrior v. H.J. Russell & Co.*, 45 F. Supp. 2d 1358)(N.D. GA. 1999)(the court held in section 1981 case that at-will employment exists because "the ongoing exchange of labor and pay represents their contract").

It is undisputed that an exchange of pay for labor did not exist during Plaintiff's volunteer tenure with the District. First, Plaintiff was not paid when he chose to volunteer with the District. (Pl. Dep. 91-93; Howe Decl. ¶11). Second, Plaintiff did not receive benefits such as life insurance, health insurance, or disability insurance. (Pl. Dep. 91-93; Howe Decl. ¶11). Finally, Plaintiff did not

have a fixed schedule, and was free to volunteer if and when he wanted.  (Pl. Dep. 82-83; Howe Decl. ¶11).   These undisputed facts demonstrate Plaintiff was a volunteer as opposed to an at-will employee.

Moreover, the statute governing employment of professional firefighters differentiates clearly between a volunteer and an employed firefighter.  The statute states as follows:

> For purposes of this section, the term "employ" ***means to pay an individual a salary, wage, or other compensation for the performance of work. The term does not include the payment of expenses, reasonable benefits, a nominal fee, or a combination thereof to a volunteer*** . . ..

Fla. Stat. § 633.416(7)(emphasis added).   Plaintiff did not receive any pay or benefits for his volunteer services and was only covered by the District's workers compensation insurance because it is required under Florida law.[1]  (Howe Decl. ¶11).   Plaintiff was a volunteer based on the facts of this case and the aforementioned statutory language, and not an "at-will" employee.  *See* Fla. Stat. § 633.416(7).

## C.   The District is Entitled to Summary Judgment on Plaintiff's Section 1981 Race Discrimination Claim when Analyzed in the Non-Employment Context.

To state a claim for non-employment discrimination under section 1981 Plaintiff must present facts establishing he is (1) a member of a racial minority; (2)

---

[1] Some volunteers received a discretionary Christmas bonus that did not exceed $200.00 in 2017 and 2018.  (Howe Decl. ¶11).

that the defendant intended to racially discriminate against him; and (3) the discrimination concerned one or more of the activities enumerated in the statute. *Jimenez v. Wellstar Health Sys.*, 596 F.3d 1304, 1308 (11th Cir. 2010).  In relation to the second prong, "[s]ection 1981 requires specific proof of an intent to discriminate."  *Brown v. American Honda Motor Co.*, 939 F.2d 946 (11th Cir. 1991); *see also Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 391, (holding that "§ 1981 . . . can only be violated by **purposeful** discrimination")(emphasis in original).

### 1.   The Evidence Does Not Establish the District Intended to Discriminate Against Plaintiff.

Plaintiff falls short as a matter of law of establishing the District intended to discriminate against him.  Plaintiff's Second Amended Complaint refutes any suggestion that Plaintiff was subjected to intentional race discrimination. Moreover, the undisputed evidence that came out during discovery establishes that the alleged behaviors Plaintiff claims are race discrimination also happened to Caucasian volunteers, were explained with unrebutted evidence that they were unrelated to Plaintiff's race or the behaviors did not make any mention to Plaintiff or his race, did not result in any adverse consequences to Plaintiff, and/or are conclusory.

Plaintiff's Second Amended Complaint undermines entirely any suggestion that Clarke engaged in "purposeful discrimination" by conceding he did not know

whether Clarke's alleged behavior was motivated by reasons unrelated to race such as Plaintiff being skinny, not residing in the district, or "something else."[2]   (*See Second Amended Complaint*, p. 11, ¶ 32).   Moreover, any suggestion that the allegations pertaining to Clarke, McMaster, Cutler, and Howe constitute "purposeful discrimination" is undermined further when Plaintiff concedes in the Second Amended Complaint that at best there is only an "inference" of race discrimination and that the alleged behavior was based "at least in part" on race. (*See Second Amended Complaint*, pp. 4, 13, ¶¶ 10, 43). Said allegations in conjunction with the following record evidence refute Plaintiff's conclusory allegation that the District intended to discriminate against him based on race.

The alleged race discrimination attributed to Jason Clarke does not constitute intentional discrimination.   First, Plaintiff admitted that Clarke never told him he treated Plaintiff differently because of his race.   (Pl. Dep. 113). Second, Plaintiff claimed Clarke would "bully' him but admitted Clarke also bullied Caucasian volunteers and firefighters.  (Pl. Dep. 148-49).   Third, Plaintiff alleged Clarke failed to take him on a call three times but it is undisputed that Clarke did not take a Caucasian volunteer on three calls.  (Pl. Dep. 94-95, 198-99; Taylor Decl. ¶¶ 1, 4; Clarke Dep. 65).  Fourth, Plaintiff claimed Clarke left him in

---

[2] Plaintiff's attempt to couch the concession as a rhetorical question in the Second Amended Complaint to minimize its significance after it was raised as a basis to dismiss the amended complaint is undermined by the record evidence addressed later in this section.

the truck when responding to a call but admitted Clarke did the same to a Caucasian volunteer.  (Pl. Dep. 176-77).  Fifth, Plaintiff alleged Clarke spread a rumor about Plaintiff administering oxygen and nitroglycerin during an off duty incident, and stealing but admits he did not get in trouble as a result of the purported rumors.  (Pl. Dep. 98).  Sixth, Plaintiff claims Clarke posted a "Butthurt Report" that was directed at Plaintiff, but the report does not contain Plaintiff's name, any identifying reference to Plaintiff, or any racially derogatory comments. (Pl. Dep. 99; Ex. 17).  Finally, Plaintiff alleged Clarke posted an image of Plaintiff "adjusting himself" but admitted the image showed Plaintiff inside Clarke's room without permission while Clarke was on a call.  (Pl. Dep. 107-08).  Significantly, Plaintiff's complaint about the image was that it showed him "adjusting himself" as opposed to being racially offensive.  (Pl. Dep. 107-08).

The purported race discrimination attributed to Dennis McMaster does not constitute intentional discrimination.   The only alleged race discrimination attributed to McMaster is that he failed to do anything when Plaintiff purportedly told him that Clarke was not letting him go on calls and making him stay in the vehicle because of his race.  (Pl. Dep. 114).  Plaintiff admitted, however, that he does not know whether McMaster addressed his alleged complaint about Clarke or whether McMaster spoke to Clarke about the alleged complaint.  (Pl. Dep. 114-15).  McMaster never told Plaintiff that he was discriminating against him or that

he did not address Plaintiff's alleged complaint because of his race. (Pl. Dep. 115).

The purported race discrimination attributed to Brian Howe does not constitute intentional discrimination. First, Plaintiff claimed Howe was in the room when the word "monkey" was said but admits he does not know who said the alleged remark. (Pl. Dep. 120). Second, Plaintiff never spoke to Howe about the Facebook posting comparing the physical resemblance of the Hitler photograph to Howe's picture, and Plaintiff does not know whether Howe was joking about the their physical resemblance. (Pl. Dep. 121-22; Howe Decl. ¶14, Ex. A). Howe's comparison of the photographs was a joke, and he never told Plaintiff that the comparison of the pictures was done because Howe is a racist. (Howe Decl. ¶14; Pl. Dep. 122). Finally, Plaintiff does not know Howe's political affiliation, or the reason Howe was being critical of President Obama or Hillary Clinton on Facebook. (Pl. Dep. 123-24). Thus, it is undisputed Howe's Facebook posts were politically motivated because he is a Republican. (Howe Decl. ¶15, Ex. B). Significantly, Howe never told Plaintiff that he was being critical of President Obama because Howe is a racist. (Pl. Dep. 124).

The alleged race discrimination attributed to Edward Cutler does not constitute intentional discrimination. Plaintiff claimed Cutler removed him from the volunteer roster because of his race but it is undisputed Cutler previously removed a Caucasian volunteer from the roster. (Cutler Dep. 50-51, 55; Cutler

Decl. ¶6).   Plaintiff also alleged Cutler was involved in a conversation during which the word "monkey" was purportedly used to refer to Plaintiff.   (Pl. Dep. 116).   As previously stated, Plaintiff admitted he does not know who said "monkey." (Pl. Dep. 116-17, 212-13).

The alleged race discrimination attributed to Howe and Cutler because they purportedly failed to address Plaintiff's complaints does not constitute intentional discrimination.   First, Plaintiff claimed Howe and Cutler did not address his alleged complaint about Clarke leaving him at the station and in the truck, but it is undisputed Clarke left a Caucasian volunteer at the station and inside the truck. (Pl. Dep. 176-77; Taylor Decl. ¶4; Clarke Dep. 65).   Second, Plaintiff alleged Howe did not address his alleged complaint about Clarke saying he administered oxygen and nitroglycerin but it is undisputed Plaintiff did not get in trouble because of Clarke's purported comment.   (Pl. Dep. 98).   Third, Plaintiff claimed Cutler did not address the posting of the "Butthurt Report" and the image of Plaintiff allegedly "adjusting himself."   However, the report does not contain Plaintiff's name, any identifying reference to Plaintiff, or any racially derogatory comments, and the image of Plaintiff showed him inside Clarke's room without permission while Clarke was on a call.   (Pl. Dep. 99, 107-08; Ex. 17).   Also, Plaintiff's complaint about the image was that it showed him "adjusting himself" as opposed to being racially offensive.   (Pl. Dep. 107-08).   Lastly, Plaintiff alleged

he complained to Cutler about McMaster not taking corrective action against Clarke but it is undisputed Plaintiff does not know whether McMaster addressed his alleged complaint about Clarke. (Pl. Dep. 114-15).

> ### 2. The record does not contain any evidence connecting the alleged race discrimination to any of the requisite activities enumerated in section 1981.

Plaintiff did not present significantly probative evidence that the purported race discrimination was directed at making or enforcing a contract, suing, being a party, or providing evidence. In fact, the evidence that does exist establishes a complete absence of any link between the alleged race discrimination and the activities enumerated in section 1981. Plaintiff did not have to sign a contract to volunteer at the District, and never signed any contract pertaining to his volunteer status with the District. (Pl. Dep. 67). Additionally, no one at the District prevented Plaintiff from making or enforcing any contracts, initiating a legal action, being a party in any legal action, or giving evidence in any type of proceeding. (Pl. Dep. 142-43).

**D.    The District is Entitled to Summary Judgment on Plaintiff's Section 1981 Race Discrimination Claim Assuming the Case is Analyzed in the Employment Context Because he Cannot Establish a *Prime Facie* Case of Race Discrimination.**

To establish a *prima facie* case of race discrimination Plaintiff must prove that he (1) is a member of a protected class, (2) was qualified for his alleged position, (3) suffered a materially adverse employment action, and (4) was

replaced by someone outside of his protected class or treated less favorably than a similarly situated employee outside of his class. *Maynard v. Bd. of Regents of the Div. of Univs. of the Fla. Dep't of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003).

### 1.   Plaintiff was not qualified to be a volunteer firefighter.

Florida law requires possession of an active Firefighter I Certification to be a volunteer firefighter.  *See* Fla Stat. § 633.416(2)("A fire service provider may not retain the services of an individual volunteering to extinguish fires . . . unless the individual holds a current and valid Volunteer Firefighter Certificate of Completion.").  It is undisputed Plaintiff did not have a Firefighter I Certification during his tenure with the District.  (Pl. Depo. 30, 151).

### 2.   Plaintiff did not suffer a "materially adverse employment action."

The Eleventh Circuit has stated as follows in relation to adverse employment actions:

> [T]o prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a **serious and material change in the terms, conditions, or privileges of employment**. Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances.

> Although the statute does not require proof of direct economic consequences in all cases, the asserted impact cannot be speculative and must at least have a tangible adverse effect on the **plaintiff's employment**.

*Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239-40 (11th Cir. 2001)(emphasis added).  In this case it is undisputed Plaintiff did not have a fixed

schedule, was free to volunteer if and when he wanted, was not paid when he chose to volunteer with the District, and Plaintiff did not receive benefits such as life insurance, health insurance, or disability insurance. (Pl. Dep. 82-83, 91-93; Howe Decl. ¶11). Thus, Plaintiff was a volunteer and all his allegations of discrimination, including but not limited to his removal from the District's volunteer roster, could not have a "serious and material change in the terms, conditions, or privileges of employment" or a "tangible adverse effect on the plaintiff's employment." *Davis*, 245 F.3d at 1239-40; *see also* Fla Stat. § 633.416(7)("For purposes of this section, the term 'employ' means to pay an individual a salary, wage, or other compensation for the performance of work. The term does not include the payment of expenses, reasonable benefits, a nominal fee, or a combination thereof to a volunteer . . ..").

Plaintiff's allegations of discrimination unrelated to his removal from the volunteer roster, such as being called a "monkey," posting his image and the "Butthurt Report," not being taken on calls and left in the truck, saying he was administering oxygen and nitroglycerin or stealing, being told he is not needed, and Howe's Facebook posts are not "materially adverse" as a matter of law. *See Akins v. Fulton County, Georgia*, 420 F.3d 1293, 1300-02 (11th Cir. 2005)(threats of termination do not constitute adverse employment actions); *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 708 (5th Cir.), *cert. denied*, 522 U.S. 932, 118 S.Ct. 336,

139 L.Ed.2d 260 (1997)(holding that threats of discharge are not adverse employment actions); *Nunez v. City of Los Angeles,* 147 F.3d 867, 875 (9th Cir.1998)("Mere threats and harsh words are insufficient" to constitute an adverse employment action"); *Mistretta v. Volusia County Dep't of Corrections,* 61 F.Supp.2d 1255, 1260 (M.D.Fla.1999)("[v]erbal reprimands and threats of termination do not constitute adverse employment actions"); *Smiley v. Jekyll Island* 1261 *State Park Authority,* 12 F.Supp.2d 1377, 1382 (S.D.Ga.1998)(finding that plaintiff's allegations that his supervisor slapped him, verbally abused him and criticized his job performance do not establish adverse employment action).

**E.  The District is Entitled to Summary Judgment on Plaintiff's Section 1981 Retaliation Claim Because he Cannot Establish a *Prime Facie* Case.**

To establish a *prima facie* case of retaliation under section 1981 Plaintiff must demonstrate that he (1) engaged in statutorily protected activity; (2) suffered a materially adverse employment action; and (3) there was some causal relationship between the statutorily protected activity and materially adverse employment action.  *See Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008).

**1.  <u>Plaintiff failed to establish protected activity under section 1981</u>.**

Plaintiff must establish that the "protected activity involve[d] the assertion of rights encompassed by the statute" to engage in protected activity under section

1981.  *Jimenez v. Wellstar Health Sys.*, 596 F.3d 1304, 1311 (11th Cir. 2010).  It is undisputed in this case that Plaintiff did not have to sign a contract to volunteer at the District, and his alleged right to contract as a volunteer was not impaired. (Pl. Depo. 23-24, 30, 67, 151, 179, 184-85; Ex. 9, p. 3, 5-6).  Additionally, Plaintiff's volunteer status with the District is governed by statute as opposed to a purported contract.  *See* Fla Stat. § 633.416(2), (3)(a), (4)(a) 2, 4, (4)(b) 1-4.   Thus, Plaintiff's alleged protected activities do not involve the assertion of rights encompassed by section 1981.  *See Jimenez*, 596 F.3d at 1311 (affirming dismissal of section 1981 retaliation claim because suspension of plaintiff's hospital privileges did not implicate rights protected under section 1981 where plaintiff did not have a contract or property interest in maintaining such privileges under Georgia law); *Stephen v. H. Lee Moffitt Cancer Ctr. & Resch. Inst. Lifetime Cancer Screening Ctr., Inc.*, 259 F. Supp. 3d 1323, 1341 (M.D. Fla. 2017)("[T]o state a claim for retaliation pursuant to § 1981, the protected activity must have been the type that § 1981 was enacted to prevent i.e., racial discrimination in the making and enforcement of contracts.").

### 2.      <u>Plaintiff did not suffer a materially adverse employment action.</u>

In a retaliation case, the adverse employment action prong requires the plaintiff to show that the action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe*

*Ry. Co. v. White*, 548 U.S. 53, 68 (2006).  To meet this standard, the action must produce an "injury or harm[,]" and must constitute "material and substantial action[.]" *Cabrera v. Sec'y, Dep't of Transp.*, 468 F. App'x 939, 942 (11th Cir. 2012).  In this case, Plaintiff's removal from the volunteer roster did not produce "injury or harm" and was not a "material and substantial action" because Plaintiff was a volunteer, was not paid, did not receive any benefits for his volunteer services, and was able to independently pursue his Firefighter I Certification after being removed from the roster.  (Pl. Dep. 91-93, Ex. 9, p. 3, 5-6; Howe Decl. ¶11).[3]

**F.     The District is Entitled to Summary Judgment on Plaintiff's Whistleblower Retaliation Claim Because he Cannot Establish a *Prime Facie* Case.**

To establish a *prima facie* case of whistleblower retaliation Plaintiff must demonstrate that he (1) engaged in statutorily protected activity; (2) suffered a materially adverse employment action; and (3) that a causal connection exists between the protected activity and adverse employment action.[4]  *King v. Bd. of Cty. Comm'rs*, 226 F. Supp. 1328, 1336 (M.D. Fla. 2016).  In relation to the protected activity prong, section 112.3187 only protects employees and persons:

---

[3] Plaintiff also fails to establish the causal relationship prong as a result of the deficient adverse action prong.

[4] The District incorporates and adopts as a basis for summary judgment on the whistleblower claim the adverse action and causal connection arguments contained in Section II, E, 2, herein.

1. Who disclose information on their own initiative in a written and signed complaint;

2. Who are requested to participate in an investigation, hearing, or other inquiry conducted by any agency or federal government entity;

3. Who refuse to participate in any adverse action prohibited by this section;

4. Who initiate a complaint through the whistle-blower's hotline or the hotline of the Medicaid Fraud Control Unit of the Department of Legal Affairs; or

5. Who file any written complaint to their supervisory officials or employees who submit a complaint to the Chief Inspector General in the Executive Office of the Governor, to the employee designated as agency inspector general under section 112.3189(1), or to the Florida Commission on Human Relations.

Fla. Stat. § 112.3187(7).  It is undisputed Plaintiff does not fall under any of the aforementioned categories.

First, Plaintiff did not present a written complaint against anyone at the District.  (Pl. Dep. 146-47, 151-54, 158-60, 173).  *See Scheirich v. Town of Hillsboro Beach*, 2008 U.S. Dist. LEXIS 4090, 2008 WL 186621 (S.D. Fla. Jan. 18, 2008)(alleged conversations in which Plaintiff verbally "expressed," "reported," or "made others aware of" the alleged mismanagement are not covered by the statute); *Walker v. Fla. Dep't of Veterans' Affairs*, 925 So. 2d 1149, 1150 (Fla. 4th DCA 2006)(Under section 112.3187(7) a protected disclosure requires an employee's "written and signed complaint," or a "written complaint to [the employee's] supervisory official."). *Hutchison v. Prudential Ins. Co. of America,*

*Inc.*, 645 So. 2d 1047, 1050 (Fla. 3d DCA 1994)(The statute requires a written document "to document what the employee disclosed, and to whom the employee disclosed it, thus avoiding problems of proof for purposes of the Whistle-blower's Act.").   Second, Plaintiff did not participate in any investigation, hearing, or inquiry that was conducted by a local, state, or federal entity.  (Pl. Dep. 167-68, 192-93).   Third, Plaintiff never initiated a complaint through a whistleblower hotline, the hotline of the Medicaid Fraud Control Unit of the Department of Legal Affairs, the Chief Inspector General of the Executive Office of the Governor, the Florida Commission on Human Relations, a District employee designated as the District's Inspector General, or a written complaint with any supervisor of the District. (Pl. Dep. 172-74).  Finally, Plaintiff did not have authority to impose any type of adverse action on District employees or volunteers, was never told to impose adverse action on them, and never imposed any type of adverse action on anyone at the District.  (Pl. Dep. 168-72).

## G.    Conclusion.

The District respectfully requests an order granting summary judgment to the District and against Plaintiff on all counts, and enter judgment on behalf of the District.

## <u>CERTIFICATE OF WORD COUNT</u>

Pursuant to Rule 7.1, Local Rules of the Northern District of Florida, Defendant hereby certifies that the above Defendant's Statement of Facts and Memorandum of Law In Support of Its Motion for Summary Judgment contains 7,993 words, excluding the case style, signature block, and certificates of word count and service, and is in 14 point font.

Respectfully submitted,

FORD**HARRISON**<sup>LLP</sup>

By: s/ Reynaldo Velazquez
Reynaldo Velazquez
Florida Bar No. 069779
rvelazquez@fordharrison.com
One S.E. 3rd Avenue, Suite 2130
Miami, Florida 33131
T (305) 808-2100 | F (305) 808-2101

Attorney for Defendant

## <u>CERTIFICATE OF SERVICE</u>

I CERTIFY that on May 15, 2019, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the attorney of record for Plaintiff, Marie A. Mattox, Esquire, MARIE A. MATTOX, P.A., which is located at 203 N. Gadsden Street, Tallahassee, FL 32301, via electronic mail at: <u>marie@mattoxlaw.com</u>; <u>michelle2@mattoxlaw.com</u>; <u>marlene@mattowlaw.com</u>.

 s/ Reynaldo Velazquez
Attorney for Defendant

WSACTIVELLP:10470305.1